## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | |
|---|---|
| CHARLES W. WALKER, SR.,   ) | |
| ) | |
| Petitioner,   ) | Civil Action No. 3:10-2464-RMG-JRM |
| ) | |
| v.   ) | |
| ) | **REPORT AND RECOMMENDATION** |
| MILDRED RIVERA,   ) | |
| WARDEN FCI ESTILL,   ) | |
| ) | |
| Respondent.   ) | |
| _____) | |

Petitioner, Charles W. Walker, Sr. ("Walker"), is an inmate at FCI-Estill serving 121 month sentence imposed in the Southern District of Georgia in 2005. He filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 on September 21, 2010, challenging his convictions after the recent decision of Skilling v. U.S., 130 S.Ct. 2896 (2010), by the Supreme Court. He contends that due to this ruling and the ruling of Weyhrauch v. United States, 130 S.Ct. 2971 (2010), that application of the statute to the conduct of conviction in his case renders the conviction unconstitutional. Respondent, the Warden of FCI-Estill, filed a "Motion to Dismiss" on December 13, 2010. After being granted an extension to respond, Walker filed his response on January 11, 2011.

## **Background and Procedural History**

On June 3, 2005, Walker, a former State Senator was convicted by jury verdict of two counts of conspiracy in violation of 18 U.S.C. § 371 (Counts 1 and 82); eighty-five counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 2-40, the "Augusta Focus counts;" and Counts 83-128, the

1

"Classic counts"); thirty-six counts of "honest services" mail fraud in violation of 18 U.S.C. § 1341 and 1346 (Counts 41-48, the "Grady counts;" Counts 50-69, the "Medical College of Georgia counts;" and Counts 74-81, the "Political campaign counts"); and four counts of aiding and assisting in the preparation of a false charitable corporation's tax return, in violation of 26 U.S.C. § 7206(2). Walker appealed his conviction, and the Eleventh Circuit affirmed on July 6, 2007. *See* United States v. Walker, 490 F.3d 1282 (11th Cir. 2007). He then filed a 28 U.S.C. § 2255 motion *pro se,* to vacate the sentence in the District Court in the Southern District of Georgia. He obtained counsel and filed an amended motion to Vacate, Set Aside, or Correct Sentence, which was denied on January 7, 2010. Walker appealed the denial of this motion to the Eleventh Circuit.

On June 24, 2010, the United States Supreme Court decided Skilling. Walker then sought leave from the Eleventh Circuit to file a second and successive motion under 28 U.S.C. § 2255 in the Southern District of Georgia to challenge the constitutionality of his conviction under 28 U.S.C. § 1346 in light of the decision in Skilling. On September 3, 2010 the District court denied his motion pursuant to 18 U.S.C. § 2255, because his claim could not fulfill 18 U.S.C. § 2255(h), thus making a motion under the statute unavailable as a remedy. Therefore, Walker has filed the petition for writ of habeas corpus pursuant to 18 U.S.C. § 2241 with this Court.[1]

---

[1] Respondent concedes that his motion is properly filed in this Court and that § 2241 is the appropriate vehicle to raise his present claims.

2

**Grounds for Relief**

Walker asserts that he is entitled to a writ of habeas corpus on the following ground:

**Ground One:**                     Actual Innocence

>The Petitioner was convicted under the 'honest services" statute, 18 U.S.C. § 1346, for conduct that the United States Supreme Court recently held, in Skilling v. United States, 130 S.Ct. 2896 (2010) and Weyhrauch v. United States, 130 S.Ct. 2971 (2010), is not a crime. Therefore the application of the "honest services" statute to the conduct of conviction renders the convictions obtained under that section unconstitutional. Petitioner's remaining convictions were tainted by spillover from the § 1346 convictions, rendering those convictions also unconstitutional. Further, the sentencing court gave a steep upward departure expressly because it believed that the Guidelines sentence did not adequately punish Petitioner for the "honest services" fraud convictions.

**Discussion**

Walker, a businessman and Georgia state senator from Augusta, together with his daughter, Yolanda Monique Walker ("Monique"), and three of his corporations, The CWW Group, Inc. ("The Walker Group"), Georgia Personnel Services, Inc. ("Georgia Personnel"), and The Augusta Focus, Inc. ("The Augusta Focus"), were named in a 142 counts indictment alleging mail fraud, Walker's use of his office for personal gain, making of false tax returns, and assisting in the preparation of a false charitable tax return. The Augusta Focus was a newspaper published by Walker; Georgia Personnel was a staffing company owned by Walker that provided temporary workers to hospitals and other businesses; and the Walker Group was a holding company that owned Walker's other companies. Monique, an attorney, who among other duties was the chief operating officer of The Walker Group. (Indictment, ¶ 2).

The indictment charged that the defendants devised and operated five separate mail fraud

schemes:

1. The Augusta Focus counts alleged that Walker, The Walker Group, and The Augusta Focus "engaged in a scheme to fraudulently obtain profits from businesses that advertised in The Augusta Focus by misrepresentation of the newspaper's circulation." United States v. Walker, 490 F.3d at 1287.

2. The Grady counts alleged that Walker, The Walker Group and Georgia Personnel "engaged in a scheme to misuse Walker's position as a state legislator for private gain by receiving business favors, including a contract to hire Georgia Personnel workers from Grady Memorial Hospital ("Grady") in return for Walker's help with legislation affecting Grady." *Id.* In addition to mail fraud, 18 U.S.C. § 1341, the Grady counts jointly alleged honest services fraud in violation of 18 U.S.C. § 1346.

3. The Medical College of Georgia counts alleged that Walker and other defendants engaged "in a scheme to improperly transact business with a state entity, the Medical College of Georgia ("the Medical College"), by : (a) misrepresenting to the Medical College that Walker did not own a substantial interest in Georgia Personnel or the Augusta Focus when he did;[2] and (b) failing to disclose Walker's transactions with the Medical College on state-mandated financial disclosure reports." *Id.,* at 288. The Medical College counts also jointly alleged mail fraud and honest services fraud.

4. The Political Campaign Account counts alleged that Walker engaged in a scheme to defraud donors to his political campaigns and the public by misusing his campaign account for his own personal uses and concealing the illegal expenditures by filing

---

[2]Under Georgia law a legislator is limited in engaging in business with a state entity.

4

>   false campaign contribution disclosure reports which he was required to make under state law. The Political Campaign Account counts also jointly alleged mail fraud and honest services fraud.

5.  The C.S.R.A. Classic, Inc. counts, alleged that Walker set up the C.S.R.A. Classic, Inc. ("the Classic") as a vehicle to ostensibly raise funds for the underprivileged college students. The Classic counts allege that Walker and The Walker Group engaged in a mail fraud scheme to steal proceeds from the Classic's annual fundraising events.

The remaining counts in the indictment charged tax violations. Counts 129-133 charged Walker with filing false tax returns from 1998 through 2002. Counts 134-138 charged Monique with filing false tax returns for those same years. Counts 139-142 charged Walker and Monique with aiding and abetting in the preparation of fraudulent charitable corporate tax returns with respect to the Classic for years 1998 through 2001.

At the close of the case, the court instructed the jury on the law of all counts.[3] The Augusta Focus counts and the Classic counts were charged as conventional mail fraud, i.e., the defendants used the mail to obtain increased advertising fees from those advertising in The Augusta Focus and to obtain money or property from donors to the Classic using false pretenses, representations and promises. However, with respect to the Grady counts, the Medical College counts, and the Political Campaign Account counts, the court coupled the conventional mail fraud charge with an honest services mail fraud instruction. The jury returned a general verdict with respect to the Grady counts,

---

[3] A copy of the court's instructions which were given to the jury to use in their deliberations is attached to the trial transcript and is a part of the record before this Court.

the Medical College counts, and the Political Campaign Account counts, i.e., it did not make a specific finding on those counts of conviction as to whether the conviction was for conventional mail fraud, honest services mail fraud, or both.

Walker asserts that his "honest services" fraud convictions should be reversed because the Skilling decision rendered his criminal conduct to be not criminal. In this regard, Walker views all his convictions in the Grady counts, the Medical College counts, and the Political Campaign Account counts to be honest services convictions. Walker also asserts that his convictions for conventional mail fraud should be reversed because they were tainted by the Government's honest services theory of the case. (*See* Walker's Memorandum attached to his Petition, at p. 2). Conversely, Respondent argues that the Grady counts of conviction are sustainable post-Skilling as they involved bribes and kickbacks, and that the Medical College and Political Campaign Account counts and the other mail fraud counts remain viable under conventional pecuniary mail fraud concepts.

The Grady, Medical College, and Political Campaign Account counts were indicted, presented by the Government, and instructed by the court as both mail fraud and honest services fraud violations. The Skilling decision rendered the honest services fraud theory invalid unless it was based on bribes and kickbacks. Errors of this type do not automatically entitle a defendant to a new trial, but are subject to harmless error analysis. In Hedgepath v. Pulido, 555 U.S. 57, 129 S.Ct. 530, 531, 172 L.Ed. 2d 388 (2008), the Supreme Court noted that "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). *See* United States v. Rezko, __ F.Supp.2d __, 2011 WL 830459, \*6 (N.D. Ill. ). On a Brecht analysis, "the Government has the burden of establishing that it is clear beyond a reasonable doubt that the jury

would have convicted absent the error." *Id.* citing United States v. L.E Myers Co., 562 F.3d 845, 855 (7th Cir. 2009), United States v. Mansoori, 480 F. 3d 514, 523 (7th Cir. 2007) and United States v. Ramirez, 574 F.3d 869, 884 (7th Cir. 2009).

    A.  The Grady Counts

Respondent asserts that the honest services charge given with respect to the Grady counts was not error because those counts were based on a bribery/kickback scheme. Walker argues that the Government changed its bribery/kickback theory of the Grady counts when a witness, Nadine Thomas, offered unexpected testimony at trial concerning a particular piece of legislation. (Pet.Mem., pp. 9-14).

Walker was Majority Leader of the Georgia Senate and served as Chairman of the Health and Human Resources Committee ("the Committee"). Among the issues dealt with by the Committee was Medicaid funding for hospital services. The indictment specifically alleges that Walker manipulated House Bill 765, which allowed "Georgia hospitals to contract with and to continue to receive Medicaid funds from the State of Georgia." (Indictment, p. 24). The indictment alleges that as a part of Walker's fraud scheme, passage of House Bill 765 was held up. However, the indictment also alleged a broader fraud scheme involving the use of temporary workers from Georgia Personnel by Grady in return for Walker's help in the Georgia Legislature. The proof relating to House Bill 765 fell short at trial when a Senate colleague testified that the bill had not been held up by Walker in the Committee. (Tr. 1208-1209). During closing arguments the Government conceded that it had failed to prove that Walker had delayed passage of House Bill 765. However, the Government detailed the proof produced at trial about the broader conspiracy. (Tr. 2490).

The Georgia General Assembly begins in January of each year. (Tr. 1207). House Bill 765

7

was introduced and passed during the 1995 session. Edward Renford ("Renford") was the CEO of Grady during this time. He testified that he met Walker during the 1995 legislative session, and they discussed using Walker's company to help fill Grady's staffing needs. (Tr. 1785-1786). Joyce Harris ("Harris") was the Government's chief witness with respect to the Grady counts. She was the Senior Vice President of Human Resources at Grady in 1995. Harris testified that Renford introduced her to Walker in 1995, and that House Bill 765 meant $40,000,000 to Grady. Renford told Harris that they (Grady) were going to begin doing business with Walker "because he will help us in the legislature." (Tr. 1237). Soon thereafter, Grady began using Walker's company to hire temporary workers. Renford insisted that Grady use Walker's company despite irregularities in the bidding process and the fact that it was more expensive to use Walker's employees. Renford had Harris supply reports so that Renford could use them to show Walker the number of Walker's temporary employees Grady was using. Walker met with Harris to encourage Grady to use even more of his temporary employees. (Tr. 1234-1258). Glendol Browder, Director of Recruitment and Employment, and Marilyn Smith Robinson, Manager of Pro Temps at Grady generally corroborated Harris' testimony.

In its jury instructions, the trial court defined mail fraud and honest services mail fraud. The court charged in part:

> Public officials and public employees inherently owe a duty to the public to act in the public's best interest. If, instead, the official acts or makes his decision based on the official's own personal interests - - such as accepting a bribe [or] taking a kickback...the official has defrauded the public of the official honest services...[T]he law is violated when a legislator accepts a bribe...

The trial court did not define "bribe" or "kickback." In Skilling, the Supreme Court did not specifically define bribes and kickbacks, but referred to several statutes including 18 U.S.C. §

201(b)(2) (bribes) and 41 U.S.C. § 52(2) (kickbacks). Under these statutes direct or indirect compensation is sufficient and it does not have to be based on the public official taking any specific action on behalf of another. *See* United States v. Rezko, at *5.

After reviewing the trial record, including the court's instructions, the evidence and the arguments of the Government, the undersigned concludes beyond a reasonable doubt that no reasonable jury could have found Walker guilty of honest services fraud based on conduct not involving bribery or kickbacks. *Id.*, at *8.

B. The Medical College and Political Campaign Account Counts

The Government concedes that there is no evidence to sustain the Medical College and Political Campaign Account counts under a post-Skilling honest services mail fraud theory because there were no bribes or kickbacks involved in those schemes. However, the Government contends that Walker is not entitled to habeas relief from these convictions because the evidence was sufficient to convict Walker under the alternative pecuniary mail fraud theory. In order to establish mail fraud pursuant to 18 U.S.C. § 1341, the Government must prove beyond a reasonable doubt that "the defendant (1) participated in a scheme or artifice to defraud and (2) used the United States mails to carry out the scheme." United States v. Walker, 490 F.3d at 1296 citing United States v. Hooshmand, 931 F.2d 725, 731 (11th Cir. 1991).[4]

The fraudulent statements made by Walker to the Medical College were misrepresentations as to Walker's ownership of Georgia Personnel Services and the Augusta Focus. The Medical College is a state entity. Georgia law prohibits or limits its public officials from doing business with

---

[4] The Fourth Circuit also recognizes the classic two essential elements of mail fraud. Eric Wm. Ruschky, PATTERN JURY INSTRUCTIONS, 265 n. 687(2011).

9

a state entity. *See* United States v. Walker, 490 F.3d at 1288 citing Ga.Code Ann. §§ 45-10-1 to -94 (conflicts of interest) and §§ 21-5-1 to -76 (Ethics in Government Act). The indictment alleged that Walker made misrepresentations to circumvent these provisions. After alleging the scope of Walker's scheme, the indictment alleged that the Medical College mailed checks to Georgia Personnel Services and the Augusta Focus as a result of Walker's misrepresentations. (*See* Indictment, Counts 50 - 69).

In opening arguments, the Government outlined a traditional pecuniary fraud scheme.

> This scheme involves Senator Walker's lies and deception to the Medical College of Georgia officials in order to get around the state conflict of interest law which prohibited Mr. Walker's business, the Augusta Focus and Georgia Personnel Services, from doing business with the Medical College of Georgia. In other words, Mr. Walker lied to those Medical College of Georgia officials about who actually owned Georgia Personnel and the Augusta Focus. The Evidence will show that the Walker Group owned the majority of Georgia Personnel Services and the Augusta Focus and that Mr. Walker was the owner of the Walker Group.
>
> This scheme involves Mr. Walker's lies to MCG officials to get around the state conflict of interest law so that these businesses, that were controlled by Mr. Walker, could do business with the Medical College of Georgia which is a state entity.

(Tr. 72-73).

The main witness for the Government concerning the Medical College Counts was Gerald W. Woods, Legal Advisor to the President of the Medical College. (Tr. 1342-1371). According to Mr. Woods, Walker solicited advertising by the Medical College in the Augusta Focus in early 1997. At about the same time, Walker began to inquire about the Medical College using temporary workers from Georgia Personnel Services. Walker was referred to Woods. They had a conversation concerning the Georgia conflicts of interest laws, and in January of 1997, Woods sent Walker a letter specifically explaining the laws limiting his business opportunities with the Medical College. A

series of conversations and emails followed. Walker at first stated that his wife owned the Augusta Focus. Woods explained to Walker that the Georgia conflict of interest laws applied to spouses and dependant children. Walker responded that Frederick Benjamin, the Editor, owned the Augusta Focus. Eventually, based on Walker's misrepresentations of the actual ownership of the newspaper, the Medical College began to advertise in the Augusta Focus. Walker led the Medical College to believe that his non-dependent son owned Georgia Personnel Services and never advised the Medical College of his ownership interest.

During closing arguments the Government outlined the pecuniary mail fraud scheme involving the Medical College. (Tr. 2503-2507). The misrepresentations made by Walker were identified, and it was explained that tax returns showed that Walker owned Georgia Personnel Services, and made over $100,000 from the Medical College over a three year period. In addition to the misrepresentations made by Walker to Woods, Walker made misstatements in the disclosure reports he was required to file under Georgia law.

The Political Campaign Account counts did not involve specific misrepresentations by Walker to individuals to obtain business for his companies. These counts alleged that Walker obtained money from campaign donors "by means of false and fraudulent pretenses, representations and promises" that he would lawfully use the donations for his legitimate campaign expenses, but instead converted the money to his own personal use, for example, financing his gambling excursions, maintaining an Atlanta condominium, and giving money to acquaintances and relatives. The mailings involving the Political Campaign Account counts which Walker was found guilty of[5] related to disclosure reports mailed to the State of Georgia which failed to show the true nature of

---

[5]Walker was found not guilty of Counts 70-74.

the expenditures and a check mailed to a woman who accompanied Walker and a friend on gambling trips.

In opening arguments, the Government explained to the jury that a Georgia officeholder can expend money from his campaign account "for ordinary and necessary expenses associated with their campaign." However, the Government further explained that Walker did not do so, but instead fraudulently used his campaign account for personal expenditures and then lied about he expenditures on his disclosure reports. (Tr. 2507).

The primary witness with respect to the Political Campaign Account fraud was Special Agent Joel Ozburn of the Internal Revenue Service. (Tr. 1635). First, Special Agent Ozburn traced a check for a $38,000 payment from the Political Campaign Account to the Augusta Focus for media consulting.[6] Shortly thereafter, the Augusta Focus issued a check to Walker for $40,000 which was put into his personal account. Walker then issued a $50,000 check to "TPA," the Trump Plaza Associates Casino in Atlantic City, New Jersey to cover gambling debts. (Tr. 1685).

Special Agent Ozburn also testified about two checks totaling $2,100 issued from the Campaign Account to Samarian Kimbrough, a companion of a friend of Walker, who accompanied them on gambling junkets (Tr. 1530-1542); checks issued by the Campaign Account to cover expenses for a condominium owned by Walker in Atlanta (Tr. 1691-1692); and a check issued by the Campaign Account to obtain a money order that was sent to Walker's nephew who was in prison. (Tr. 1693). Two other witnesses testified about checks drawn on the Campaign Account to pay rent for a niece (Tr. 1510-1517), and to help another niece purchase a vehicle (Tr. 1464-1465).

---

[6]The evidence showed that the Augusta Focus was only owed about $8,000 for campaign ads that were run in the newspaper. (Tr. 1688).

12

The Government summarized the evidence of fraud during closing arguments and concluded that Walker was deceitful in his actions with respect to the Political Campaign Account. (Tr. 2507-2513). The court instructed the jury separately on mail fraud and honest services fraud.

On remand from the United States Supreme Court, the Seventh Circuit faced a similar issue to the one now raised by Walker. Three counts of mail and wire fraud had been submitted to the jury under the pecuniary fraud and honest services fraud theories. The jury had returned a general verdict. Skilling invalidated the honest services fraud convictions because there was no evidence of bribes or kickbacks. In considering whether the mail and wire fraud convictions remained valid, the Seventh Circuit framed the issue as follows:

> [I]f it is not open to reasonable doubt that a reasonable jury would have convicted them of pecuniary fraud, the convictions on the fraud counts will stand.

United States v. Black, 625 F.3d 386, 388 (7th Cir. 2010).

The court reviewed the evidence and found that some of the fraud convictions should be upheld while one was reversed.

After reviewing the record, the undersigned concludes that no reasonable jury would have failed to find that Walker participated in pecuniary mail fraud. As summarized above, the Government presented overwhelming evidence that Walker committed mail fraud in schemes to defraud the Medical College and his political donors. The evidence traced money received based on Walker's misrepresentations through different accounts and entities directly to Walker. The Government's arguments centered on pecuniary fraud, while touching on Walker's overall corruption. The count's instructions separately defined mail fraud and honest services fraud. The court specifically instructed the jury that it should not be concerned with whether or not Walker had

violated Georgia law, except to the extent that violations of state law might reflect on Walker's knowledge or intent. At trial, it was stipulated that the United States mails were used to facilitate the transactions.

      C.  The Remaining Fraud Counts

Walker asserts that he is entitled to have his convictions vacated on the other fraud counts, i.e., the Augusta Focus counts and the C.S.R.A. Classic counts, even those counts did not involve violations of § 1346. The Seventh Circuit also addressed a similar argument in its Black decision. As discussed above, the defendants in Black were convicted of mail and wire fraud, honest services fraud, as well as obstruction of justice. They argued on appeal that the convictions for obstruction of justice should be vacated due to "prejudicial spillover" from the erroneous honest services instruction. The court disagreed finding:

> The theory of honest-services fraud submitted to the jury was esoteric rather than inflammatory; the evidence of such fraud was a subset of the evidence of pecuniary fraud; and the evidence of obstruction of justice was very strong. No reasonable jury could have acquitted Black of obstruction if only it had not been instructed on honest-services fraud. It would still have been the case that Black had known he was being investigated for fraud. He could not have known that years later the Supreme Court would invalidate one of the fraud charges. And if he were clairvoyant, he would have known that the other fraud charge-pecuniary fraud-would not be invalidated.

United States v. Black, 625 F.3d at 390.

As with the other fraud counts discussed above, the Government presented overwhelming evidence that Walker misrepresented the circulation of the Augusta Focus to advertisers and that Walker diverted money raised for charity to his personal use. There was nothing inflammatory in the Government's arguments or the courts instructions. The undersigned concludes that no reasonable jury would have found Walker not guilty of the Augusta Focus counts and/or the C.S.R.A. Classic

counts had the honest services instruction not been given.

## Conclusion

Based on a review of the record, it is recommended that Respondent's motion be **granted**, and the petition **dismissed** without an evidentiary hearing.

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

August 10, 2011