UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Charles W. Walker, Sr., ) | |
| ) | C/A: No. 3:10-2464-RMG |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | **ORDER** |
| Mildred Rivera, Warden FCI Estill, ) | |
| ) | |
| Respondent. ) | |

Petitioner brought this action pursuant to 28 U.S.C. § 2241. This case was automatically referred to the United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b) and the Local Rules. The Magistrate Judge recommended that the petition be dismissed and the Respondent's motion to dismiss be granted. (Dkt. No. 21). The Petitioner has objected (Dkt. No. 24) and Respondent has filed a reply (Dkt. No. 25).

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). This Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and this Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). This Court may also "receive further evidence or recommit the matter to the magistrate with instructions." *Id*. After conducting a *de novo* review and considering the record of this matter, the applicable law, the Report and Recommendation of the Magistrate Judge, Petitioner's objections, and Respondent's reply, the petition for a writ of habeas corpus is denied for the reasons set forth below.

1

## Background

This petition arises out of the conviction of Petitioner on June 3, 2005 following an eight day trial. Petitioner formerly served as a Georgia state senator and was majority leader of the Georgia State Senate. The criminal prosecution leading to his convictions arose out of Petitioner's activities as a businessman, public official and chairman of a board operating a charity. Petitioner was convicted on the following counts:

1. One count of conspiracy, in violation of 18 U.S.C. § 371, and 39 counts of mail fraud, in violation of 18 U.S.C. § 1341, in regard to the operation of a weekly newspaper, the Augusta Focus ("Augusta Focus Counts");

2. One count of conspiracy, in violation of 18 U.S.C. § 371, 46 counts of mail fraud, in violation of 18 U.S.C. § 1341, and four counts of aiding and assisting the preparation of false charitable tax returns, in violation of 26 U.S.C. § 7206(2), in regard to the operation of a charitable entity, C.S.R.A. Classic, Inc. ("Classic Counts");

3. Eight counts of mail fraud, in violation of 18 U.S.C. § 1341, and "honest services" fraud, in violation of 18 U.S.C. § 1346, regarding dealings with Grady Hospital ("Grady Counts");

4. 20 counts of mail fraud, in violation of 18 U.S.C. § 1341, and "honest services" fraud, in violation of 18 U.S.C. § 1346, in regard to dealings with the Medical College of Georgia ("Medical College of Georgia Counts"); and

5. Eight counts of mail fraud, in violation of 18 U.S.C. § 1341, and "honest services" fraud, in violation of 18 U.S.C. § 1346, in regard to Petitioner's political campaign account ("Campaign Account Counts").

The Eleventh Circuit affirmed the convictions on direct appeal on July 6, 2007. *U.S. v. Walker*, 490 F.3d 1282 (11th Cir. 2007). Petitioner thereafter filed a 28 U.S.C. § 2255 motion *pro se*. He subsequently obtained counsel and filed an amended motion to Vacate, Set Aside or Correct Sentence, which was denied on January 7, 2010. The District Court denied the petition. Petitioner appealed the denial of this petition to the Eleventh Circuit. On August 23, 2011, the Eleventh Circuit granted a certificate of appealability, vacated the District Court's denial of the § 2255 petition and remanded the case to the District Court to address the issue of alleged ineffective assistance of counsel arising from Petitioner's attorney failing to argue on appeal that Petitioner's sentence was substantively unreasonable. *Walker v. United States*, 2011 WL 3684594 (11th Cir. 2011).

After the U.S. Supreme Court decided *Skilling v. United States*, 130 S.Ct. 2896 (2010), narrowing the circumstances under which a defendant could be convicted of "honest services" mail fraud under 18 U.S.C. § 1346, Petitioner sought leave from the Eleventh Circuit to file a second and successive motion under 28 U.S.C. § 2255 in the Southern District of Georgia to challenge the constitutionality of his conviction. On September 3, 2010, the Eleventh Circuit denied his motion pursuant to 28 U.S.C. § 2255 (h). (Dkt. No. 1-2).

Petitioner, who is presently incarcerated at the federal prison in Estill, South Carolina, thereafter filed a petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2241. Where 28 U.S.C. § 2255 is determined to be inadequate or ineffective, a petitioner for habeas relief may bring an action under § 2241 in limited circumstances. *See, In Re Jones*, 226 F.3d 328, 333 (4th Cir. 2000). The Government concedes "that the *Skilling* claim . . . is of the type that might proceed under § 2241 in the proper case." (Dkt. No. 13-1 at 5). Thus, while asserting that Petitioner is not entitled to relief under § 2241, the Government recognizes the

3

right of Petitioner to assert his claims under § 2241 regarding the impact of *Skilling* on his 2005 criminal convictions.

## Standards for Review Under § 2241

A petitioner seeking relief under § 2241 who failed to raise the issue on direct appeal faces certain barriers to relief for what the courts have described as "procedural default." *Bousley v. United States*, 523 U.S. 614 (1998). This procedural default can be excused under two, very limited circumstances. First, the petitioner can show "cause" for failing to raise the issue on direct appeal and "actual prejudice." *Bousley v. United States*, 523 U.S. at 622. The case law has been very demanding on establishing "cause" for procedural default, rejecting "novelty" and "futility" arguments where other defendants have timely raised the same issue at trial and/or on direct appeal. *Bousley v. United States*, 523 U.S. at 622; *United States v. Sanders*, 247 F.3d 139, 144-46 (4th Cir. 2001); *United States v. Harris*, 183 F.3d 313 (4th Cir. 1999). The case law has been similarly demanding regarding the showing of "actual prejudice", requiring more than "a possibility of prejudice, but . . . actual and substantive disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986). Second, the petitioner, even in the face of an unexcused procedural default, may still obtain relief under § 2241 where he can establish "actual innocence", which means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S at 623-24.

Petitioner asserts that he is entitled to relief under either theory of *Bousley*, contending that he can establish both "cause" and "actual prejudice" as well as "actual innocence." (Dkt. No. 24 at 9-11). Petitioner argues that "cause" exists because *Skilling* represented a "clear break with the past" and it would have been futile to have asserted an "honest services" challenge at trial or on direct appeal. (*Id.* at 10, citing *Stayton v. United States*, 766 F. Supp.2d 1260 (M.D.

4

Ala. 2011)). Petitioner's argument is contrary to controlling United States Supreme Court case law rejecting a "cause" finding on the basis of "futility", *United States v. Bousley*, 523 U.S. at 623, and the greater weight of post-*Skilling* case law has followed the *Bousley* holding. *See*, *Ryan v. United States*, 645 F.3d 913, 916-17 (7th Cir. 2011); *United States v. Lynch*, 2011 WL 3862842, at *3 (E.D. Pa. 2011); *United States v. Jennings*, 2011 WL 3609298, at *2-3 (D. Minn. 2011); *United States v. Scruggs*, 2011 WL 1832769, at *3 (N.D. Miss. 2011).

Petitioner further argues that the District Court's rejection of his ineffective assistance of counsel claim in the § 2255 petition relating to his attorney's failure to challenge the "honest services" counts places him in a "Catch 22" situation should this Court find a procedural default on the *Skilling* claim. (Dkt. No. 24 at 10-11). Courts have recognized that a failure of defense counsel to assert an available but not previously established constitutional claim may be the basis of a procedural default but that same omission may not be recognized as constitutionally deficient ineffective assistance of counsel. *Engel v. Isaac*, 456 U.S. 107, 131-34 (1982); *Pelmer v. White*, 877 F.2d 1518, 1523 (11th Cir. 1989).[1]

The Court finds that Petitioner cannot establish the presence of "cause" for his procedural default. Other defendants in honest services actions asserted and preserved the constitutional challenge to 18 U.S.C. § 1346 despite the fact that existing case law was decidedly against their position. *See*, *Skilling v. United States*, 130 S.Ct. 2896 (2010); *Weyhrauch v. United States*, 130 S.Ct. 2971 (2010); *Ryan v. United States*, 645 F.3d 913, 916-17 (7th Cir. 2011). Petitioner is

---

[1] This result is hardly surprising because the legal analysis for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny is "highly deferential" and is significantly different from the procedural default analysis under *Bousley*, which is very demanding for relief from procedural default.

5

not, however, without recourse because he still has an avenue of relief under § 2241 should he be able to establish "actual innocence."[2]

## *Skilling* and its Impact on Convictions

The United States Supreme Court in *Skilling v. United States* addressed the validity of a conviction for "honest services" mail fraud under 18 U.S.C. § 1346 arising out of the collapse of the Enron Corporation. The defendant asserted that the statute was unconstitutionally vague. The Court, while rejecting the argument that the statute was "irremediably vague", held that any conviction for "honest services" mail fraud must include a "fraudulent scheme[] to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." 130 S.Ct. at 2928. The Court recognized that the defendant had been convicted of "honest services" mail fraud, pecuniary mail fraud and securities fraud, which presented the possibility that his conviction would not be overturned if the Government could establish "harmless error" in the presentation of the unconstitutionally broad "honest services" mail fraud counts to the jury. *Id.* at 2934. The case was remanded to the lower court to address "harmless error" under the Court's recent decision in *Hedgpeth v. Pulido*, 555 U.S. 57 (2008).[3]

*Hedgpeth*, a habeas action under § 2254, confirmed that "constitutional errors can be harmless", particularly where "an instructional error" occurs "in the context of multiple theories

---

[2] As the Court describes more fully below, the petition ultimately fails not merely because of the absence of "cause" but also due to the fact that Petitioner cannot establish either "actual prejudice" or "actual innocence". Thus, had Petitioner established the presence of "cause" for his procedural default he would still not have been entitled to relief under § 2241.

[3] Petitioner suggests that the Court should reverse his convictions because "it is impossible to say the jury *would* have convicted but for the instructions . . . ." (Dkt. No. 24 at 7) (emphasis in the original). Petitioner's argument invokes the language utilized in *Yates v. United States*, 354 U.S. 298, 312 (1957). The Supreme Court's recent decision in *Hedgpeth* has clearly abandoned the "impossible to tell" standard (referred to as the "absolute certainty" standard) for a harmless error analysis and this Court has, therefore, applied a harmless error standard. *Hedgpeth v. Pulido*, 555 U.S. at 62. The Supreme Court in *Skilling* remanded the case to the Court of Appeals to apply a harmless error standard to review the defendant's convictions, and the Fifth Circuit applied the harmless error standard, as opposed to the "impossible to tell" standard, in affirming Skilling's convictions. *Skilling v. United States*, 130 S.Ct. at 2934; *United States v. Skilling*, 638 F.3d at 482 n. 1.

6

of guilt . . . ." 555 U.S. at 60-61. The reviewing court must determine "whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 58, *quoting Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *Brecht* settled the question of the proper standard for review of harmless error under a § 2254 habeas petition, concluding that "substantial and injurious effect or influence" standard set forth in *Ketteakos v. United States*, 328 U.S. 750, 756 (1946) was to be utilized rather than the "beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967). Subsequently, the Supreme Court ruled in *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995), another § 2254 habeas proceeding, that "where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error . . . .the petitioner must win. . . ."

A majority of appellate courts which have addressed the harmless error standard to be utilized in habeas proceedings arising under § 2255 have concluded that where a non-structural constitutional violation has occurred the proper standard is "substantial and injurious effect or influence" set forth in *Brecht*. *United States v. Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006); *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003); *Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002); *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000). A single appellate court, the Seventh Circuit, has applied the "beyond a reasonable doubt" harmless error standard of *Neder v. United States*, 527 U.S. 1, 19 (1999) in § 2255 proceedings, despite the fact that *Neder* was a direct appeal. *Lanier v. United States*, 220 F.3d 833, 839 (7th Cir. 2000). The Fourth Circuit has not yet reached the question of the proper harmless error standard for constitutional violations under § 2255, declining to address the issue in *United States v. Owen*, 407 F.3d 222, 229 (4th Cir. 2005) because the petitioner could not meet either the *Brecht* or *Chapman* standards.

7

After carefully considering this substantial body of case law and the reasoning contained therein, the Court concludes that in this matter the proper harmless error standard for review of any constitutional error in the jury charge provided in Petitioner's criminal trial is whether such error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 623. In reaching this conclusion, the Court is cognizant that this petition arises under § 2241, but finds no reason under these circumstances[4] that the standards normally utilized for evaluating harmless error for non-structural constitutional errors under § 2254 and § 2255 proceedings would not be applicable in this matter.

## Analysis

Petitioner's convictions involved five distinct schemes arising from his business, public service and charitable activities. Two of these schemes, involving the Augusta Focus newspaper and the C.S.R.A. Classic, a charitable entity, had no allegation of "honest services" mail fraud under 18 U.S.C. § 1346 and were brought as pecuniary mail fraud[5] under 18 U.S.C. § 1341, conspiracy and/or tax charges. Another two schemes, involving Petitioner's political campaign account and dealings with the Medical College of Georgia, were brought under both "honest services"[6] and pecuniary mail fraud theories and did not involve bribery or a kickback. A final scheme, involving Grady Hospital, was brought under both "honest services" and pecuniary mail fraud theories but the Government asserts a bribe was involved. Since the particular presentation

---

[4] The petition arises under § 2241 because of the use of the "savings clause" of § 2255, which allows for the use of the § 2241 remedy where § 2255 proves "inadequate or ineffective to test the legality of . . . detention." *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000).

[5] The term "pecuniary mail fraud", first apparently coined by Judge Posner, refers to violations of 18 U.S.C. § 1341. *United States v. Black*, 625 F.3d at 388. This statute prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . ."

[6] "Honest services" mail fraud "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

of these various schemes require a different analysis under *Skilling* and the related case law, they will be discussed separately below.

1. <u>Convictions based on both "honest services" and pecuniary mail fraud without a bribe or kickback</u>:

Petitioner was charged with various counts (Counts 50-69) of "honest services" and pecuniary mail fraud in regard to his dealings with the Medical College of Georgia ("MCG"). Under Georgia conflict of interest laws, Petitioner, as a state senator, has specific limitations on doing business with state agencies or entities regarding any business which was owned by him, his spouse or any dependent. Petitioner solicited advertisements from MCG for his newspaper, the Augusta Focus. The legal advisor to the president of MCG, Gerald Woods, wrote Petitioner a letter concerning the state's conflict of interest laws and explained how his ownership of the newspaper presented potential problems with MCG advertising with the paper. (Tr. 1345). Woods testified that he had several subsequent conversations with Petitioner regarding the ownership of the Augusta Focus. Petitioner initially indicated that his wife was the owner of the newspaper, but Mr. Woods explained that the state conflict of interest laws also applied to her. (Tr. 1348-50). Petitioner thereafter informed Woods that the newspaper's managing editor, Frederick Benjamin, owned the Augusta Focus. (Tr. 1354). Woods, although skeptical about Petitioner's new claim that Benjamin was the owner, wrote Petitioner a letter indicating that MCG was relying on his representation regarding ownership. (Tr. 1354, 1361). MCG thereafter purchased advertising in the Augusta Focus. Mr. Benjamin testified at trial that he was not the owner of the Augusta Focus and had signed a letter stating that he was the president after Petitioner, his employer, presented him the letter for his signature. (Tr. 600-01).

9

Another business owned by Petitioner, Georgia Personnel, also solicited business from MCG to provide temporary service employees. Petitioner's adult son communicated with Mr. Woods about MCG doing business with Georgia Personnel and indicated that he owned Georgia Personnel. (Tr. 1364). Woods thereafter wrote Petitioner a letter indicating that MCG had been informed that the son and not Petitioner owned Georgia Personnel. (Tr. 1363-66). According to Woods, Petitioner never responded to the letter or disclosed that he was, in fact, the owner of Georgia Personnel. (Tr. 1365-66). Mr. Woods testified that had he known Petitioner was the owner of Georgia Personnel or the Augusta Focus, MCG would not have done business with these companies. (Tr. 1366).[7]

Petitioner was also charged with another scheme involving the use of his political campaign account in which "honest services" and pecuniary mail fraud were alleged. Evidence was offered at trial by Petitioner's former executive assistant indicating that she had written checks from the campaign account to send funds to his nephews in prison, pay the rent at his niece's apartment, and make a payment on the Petitioner's Atlanta condominium. (Tr. 1463-67, 1692-93). False entries were thereafter made on campaign disclosure forms regarding these payments at Petitioner's direction. (*Id.,* 1512-15). There was also evidence that significant payments were made from the campaign accounts that were used to pay Petitioner's gambling debts or expenses related to his gambling trips and the payments were falsely reported to be campaign related expenses. (Tr. 598-99, 1683-1686, 1689-91).[8] The trial court charged both the

---

[7] Tax returns signed by Petitioner showed he owned 100% of the Augusta Focus and testimony demonstrated that he received the overwhelming majority of the income from Georgia Personnel. (Tr. 1674-75, 1680-82).

[8] Evidence offered at trial indicated Petitioner suffered significant gambling losses. This included losses of $195,900 at MGM Casino in Las Vegas during the period 1996-2000 and $494,000 at Trump Plaza Casino in Atlantic City during the period 2000-2003. (Tr. 1408, 1453-54).

"honest services" and pecuniary mail fraud statutes regarding Medical College of Georgia and Campaign Account Counts.

The jury convicted Petitioner of "honest services" and pecuniary mail fraud, §§ 1341 and 1346, in regard to the Medical College of Georgia and Campaign Account Counts.[9] The trial court charged the "honest services" statute as well as the pecuniary mail fraud statute. In light of *Skilling*, the charging of the "honest services" statute by the trial court was in error because these schemes did not involve a bribe or kickback. Under the harmless error analysis of *Brecht*, the Court is required to determine whether the erroneous charge has any "substantial and injurious effect or influence on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 623. The Court finds that the record overwhelmingly supports the jury's conviction on the basis of pecuniary mail fraud for both the Medical College of Georgia and Campaign Account Counts. The Court further finds that taking the record as a whole, the error in the trial court's charge regarding "honest services" mail fraud had no substantial and injurious effect or influence in determining the jury's verdict.[10] Therefore, the Court finds the error was harmless, and the record does not establish the presence of "actual prejudice" to Petitioner or his "actual innocence" regarding these counts.

2. <u>Conviction for "honest services" mail fraud in which a bribe or a kickback was involved</u>:

Petitioner was convicted of various counts associated with his efforts to obtain business with Grady Hospital for his temporary services agency, Georgia Personnel (Counts 41-48). The

---

[9] Petitioner was convicted on all of the Medical College of Georgia Counts (Counts 50-69) and was found guilty of some of the Campaign Account Counts (Counts 74-81) and not guilty of others (Counts 70-73).

[10] The Court notes that although it utilized the "substantial and injurious effect or influence" standard of *Brecht*, it would have reached the same conclusion of harmless error had the Court applied the "beyond a reasonable doubt" standard of *Chapman*.

11

jury received charges for both "honest services" and pecuniary mail fraud. The Government asserts that these convictions are left undisturbed by *Skilling* because Petitioner's actions included the receipt of a bribe (business for his temporary services agency) in exchange for his assistance in the Georgia Legislature. Petitioner vigorously contests the presence of a bribe or kickback in his dealings with Grady Hospital.

Evidence at trial revealed that a significant issue to Grady Hospital came before the Georgia Legislature in 1995, potentially representing an impact of $40 million per year. (Tr. 1237). Petitioner raised the use by Grady Hospital of his temporary services agency in a meeting at the State Capitol with the hospital's CEO, Ed Renford, who was seeking Petitioner's assistance in the pending legislation. (Tr. 1201, 1820-21). Petitioner was the chairman of the committee where the pending legislation of interest to Grady Hospital was assigned. According to the hospital's former senior vice president of human resources, Joyce Harris, she was told by Renford that Grady would be doing business with Petitioner because "he will help us in the legislature." (Tr. 1237). Shortly thereafter, Georgia Personnel began receiving business from Grady Hospital. (Tr. 1209-10, 1237-38). Harris further testified that Petitioner repeatedly demanded from her more business for Georgia Personnel, once even shouting at her about this. (Tr. 1248). Harris stated that the use of Petitioner's temporary employees was not cost effective for the hospital but Renford insisted she continue to use Georgia Personnel workers. (Tr. 1249-52). Renford also demanded from Harris that she produce weekly reports on the hospital's use of Georgia Personnel temporary employees so he could demonstrate to Petitioner the level of the hospital's usage of his company's services. (Tr. 1249, 1254). Harris testified that she was not required to prepare such weekly reports for any other company. (Tr. 1255). Grady Hospital

ultimately paid Georgia Personnel $2.6 million for its temporary service employees. (Tr. 1257, 1673).

An initial issue to be addressed is whether this scheme, for which the jury convicted Petitioner under both "honest services" and pecuniary mail fraud, necessarily involved a bribe or kickback. It is well settled that while bribery must involve a *quid pro quo*, there is no need to prove an expressed agreement by the parties. *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004). As Justice Kennedy stated in a concurring opinion in *Evans v. United States*, 504 U.S. 255, 274 (1992), a *quid pro quo* occurs with a public official "if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied." Justice Kennedy went on to observe that "the official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Id.*

Petitioner's conduct and the testimony of Ms. Harris clearly establish the presence of a bribe (the use of Georgia Personnel by Grady Hospital) in exchange for Petitioner's assistance in the Georgia Senate. The proposed use of Georgia Personnel was first raised by Petitioner at a meeting at the State Capitol with Renford to discuss the pending legislation, and Ms. Harris testified that she was advised by Renford that Georgia Personnel would be utilized by the hospital because Petitioner "will help us" in the Legislature. (Tr. 1237, 1820). Soon thereafter, Georgia Personnel began receiving business from Grady. (Tr. 1237). The CEO's persistence in utilizing Georgia Personnel even when it was not cost effective for the hospital, the preparation of weekly reports on Georgia Personnel usage to show Petitioner the level of business being provided to his company and Petitioner's repeated demands for more and more hospital business

all support the presence of a *quid pro quo* between Grady Hospital and Petitioner. The Court finds that because the Grady scheme involved a bribe, Petitioner's conviction for "honest services" mail fraud is not affected by *Skilling*.

Petitioner's arguments against the sustaining of the Grady Counts appear in large part to be an effort to relitigate the merits. Petitioner notes correctly that much of Ms. Harris' testimony was disputed by Mr. Renford, but it was for the jury, and not this Court, to weigh credibility and to determine which version of the facts was to be believed. The jury obviously and necessarily believed Ms. Harris' account of events to convict Petitioner on these counts, and her testimony clearly establishes that a *quid pro quo* was present in which Petitioner's legislative assistance was exchanged for business for Georgia Personnel, a company owned and controlled by Petitioner.

Further, Petitioner notes that the indictment included allegations that Petitioner held up certain legislation until an arrangement could be worked out with Grady Hospital, and that this portion of the Government's case was not proven at trial. (Tr. 1225-28). The Grady Counts presented to the jury involved a more general agreement to assist Grady in exchange for Georgia Personnel obtaining hospital business, and it was on the basis of this evidence Petitioner was convicted. The evidence was more than sufficient to support conviction for both "honest services" and pecuniary mail fraud.[11]

Petitioner additionally contends that he was generally prejudiced by the trial court's charging of honest services mail fraud without requiring a showing of bribery or a kickback and suggests that this taints the conviction on the Grady Counts. Taking the record as a whole, the

---

[11] Even if "honest services" mail fraud were not present, Petitioner's conviction for pecuniary mail fraud would still be sustained under 18 U.S.C. § 1341. The record clearly establishes the presence of "a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . ."

14

Court finds that the erroneous "honest services" jury charge had no substantial and injurious effect or influence in determining the jury's verdict.[12]  Therefore, the Court finds that the record does not establish any "actual prejudice" to Petitioner or his "actual innocence" regarding the Grady Counts.

3. <u>Convictions on counts not involving "honest services" mail fraud:</u>

Petitioner was convicted of two additional schemes, one involving the fraudulent selling of advertisements in the Augusta Focus and the other involving actions surrounding the operation of a charitable entity, C.S.R.A. Classic, Inc.  None of these schemes involved charges for violation of the "honest services" mail fraud statute, 18 U.S.C. § 1346.  Petitioner asserts, nonetheless, that he is entitled to reversal because the "honest services" jury charge "so pervaded the indictment and trial", that it tainted his convictions on the Classic and Augusta Focus Counts. (Dkt. No. 24 at 22).

Petitioner was alleged to have engaged in a conspiracy and to have committed pecuniary mail fraud in regard to the selling of advertisements for his newspaper, the Augusta Focus (Counts 1-40).  Advertisers were informed that the circulation was 24,000-30,000, when in reality no more than 5,000 copies of the paper were printed at a time and the actual circulation was around 1,500. (Tr. 205, 256, 260, 274, 292, 327-28, 347, 363, 413, 433, 465, 467, 575, 580-82, 1117, 1651).  Evidence offered at trial indicated Petitioner received reports of actual circulation numbers, verified the inflated and false numbers and was angered when employees told any advertisers the real circulation figures. (Tr. 434-35, 521-22, 546-47, 577, 582, 1646). Certain advertisers, including K-Mart and Best Buy, paid for the right to place inserts in the

---

[12] Again, while the Court has used the "substantial and injurious effect or influence" standard of *Brecht*, the Court would have reached the same result had the "beyond a reasonable doubt" standard of *Chapman* been applied.

Augusta Focus on the basis of false and inflated circulation numbers. (Tr. 293-94, 327-28, 347, 1665-67). Moreover, these insert advertisers would have thousands of inserts printed to be placed in the Augusta Focus, and a newspaper employee had the regular duty of taking the large number of unused inserts to a recycling center for disposition. (230, 370-71, 383-86, 483, 590, 1668). The unused advertising flyers exceeded 3 million for K-Mart and Best Buy, and the cost to K-Mart alone from the scheme exceeded $200,000. (Tr. 332-33, 1671). Petitioner was convicted on all Augusta Focus Counts under 18 U.S.C. § 1341 as pecuniary mail fraud. No "honest services" mail fraud was charged on these counts.

The Classic Counts (Counts 82-133) involved a scheme to defraud a charitable entity which had as its purpose the funding of college scholarships for needy young people. The charitable entity, C.S.R.A. Classic, Inc., conducted an annual college football game and a step show. Large sums were received from sponsors as well as from ticket and game concession sales. (Tr. 775, 779, 780-83, 788). Evidence was offered at trial that although large amounts of cash were generated in the course of these charitable events, only small cash deposits were actually made into the charity's bank accounts. (1696, 1704-05, 1712). Numerous witnesses observed Petitioner's daughter, with a law enforcement officer in her company, gathering cash from ticket booths and concession stands in the course of the charitable events. (Tr. 421, 480, 496-97, 790, 888, 1022, 1037, 1120-21, 1155, 2409, 2413-14). A number of witnesses testified that Petitioner and his daughter had full control of the finances of the charity and the cash proceeds. (Tr. 651, 653, 660, 902, 919, 905, 946-7, 1000-01, 1055, 1067, 1144). One former employee of Petitioner happened to walk into a room when the Classic cash was being counted and testified that she had never seen so much cash at one time. (Tr. 1470). An IRS agent testifying for the Government estimated, based upon ticket and concession sales, that the 2000

football game and step show generated over $90,000 in cash but only $3,572 was deposited in the charity's bank account. (Tr. 1712, 1718). Additional evidence was offered about Petitioner overcharging the charity for meals from his restaurant[13] and purchasing computers for his other businesses with funds from the charity. (Tr. 595, 664-68, 672-74, 814). Petitioner was convicted of conspiracy, pecuniary mail fraud and aiding and assisting in the preparation of a charitable corporation's tax return in regard to the Classic Counts. No "honest services" mail fraud was charged in these counts.

Petitioner alleges that the taint of the inappropriate "honest services" charge regarding other schemes prejudiced him and requires the convictions on the Classic and Augusta Focus Counts be overturned. The Court finds that the record clearly establishes that Petitioner would have been found guilty on all of the Classic and Augusta Focus Counts in the absence of the erroneous "honest services" mail fraud charge on other counts. Petitioner, consequently, suffered no substantial and injurious effect or influence in determining the jury's verdict as a result of the erroneous jury charge on the other counts.[14] The Court further finds that the record does not establish any "actual prejudice" to Petitioner or his "actual innocence" regarding the Augusta Focus and Classic Counts.

---

[13] Evidence was offered at trial that more money was paid to Petitioner's restaurant for meals by the charity than was donated for college scholarships. (Tr. 814).

[14] Although the Court used the "substantial and injurious effect or influence" standards of *Brecht* to determine whether there was harmless error present regarding the challenges to the Augusta Focus and Classic Counts, the Court would have reached the same result had the "beyond a reasonable doubt" standard of *Chapman* been applied.

## Conclusion

Based upon the record, legal authorities and discussion set forth above, the Court hereby denies Petitioner's petition for writ of habeas corpus (Dkt. No. 1) on all counts and grants the Respondent's motion to dismiss (Dkt. No. 13).

**AND IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　Richard Mark Gergel
　　　　　　　　　　　　　　　　　　　　　　　United States District Court Judge

September 22, 2011
Charleston, South Carolina